Okay, our next case is Goodluck India Limited v. Essar. We've done Tubular Products, Case No. 20-2017. Mr. Roberto, how much time did you reserve for rebuttal? Your Honor, I reserved four minutes for rebuttal. Okay, you may begin, please. Thank you, Your Honor. Good morning, and may it please the Court. The Court of International Trade erred in substituting its judgment for that of the Commerce Department as to whether the sales and cost data Goodluck attempted to submit at verification after the regulatory deadline had expired was new factual information and not merely a minor correction of existing record data. Commerce concluded that the late submitted data by Goodluck constituted significant new factual information under its regulations at 19 CFR. Counsel, the Court of International Trade found that the error was such that it only required a mathematical calculation to recalculate. Was the Court incorrect in that, and if so, why? Yes, Your Honor, the Court was incorrect in that. There's no evidence that what actually happened when the Court ordered Commerce to accept the Goodluck's information that it only took an easy mathematical fix. What happened was that Goodluck had to reallocate and recalculate its cost of production for 37 control numbers, covering 600 home market sales. That wasn't just a simple mathematical formula where it pressed a button and it changed all the numbers simply by changing the codes. Goodluck actually had to recalculate all of those costs of production. So the Court below was wrong in that, and there's no evidence. In fact, if you look at what... When you say recalculate, is that mathematical calculation? Well, I mean, all dumping margins are mathematical calculation, Your Honor, but no, it took more than simply applying a formula. Excuse me, wasn't that the presiding judge's question? I'm sorry, Your Honor? I thought the presiding judge asked you. He said wasn't there just only mathematical calculation involved here? No, there wasn't just mathematical calculation. They had to do a reallocation. Excuse me? Can I ask you whether or not the changes weren't made as a matter of mathematical calculation and you said yes? So... What am I missing here? Okay, so it was... Let me clarify, Your Honor, that it was extensive mathematical calculation involved in resubmitting the cost. Extensive calculation, that's the cascading effect. Well, the cascading effect could be several things, Your Honor. So just because when you change, for example, change the product codes, you may not have to change costs as they did in this case. All the previous cases that the Court below cited actually didn't have any of those other changes. It changed margins, it changed comparisons, but the respondent in those other cases did not have to resubmit costs as they had done in this case. What does that do to the legal posture of the case? Does it require a petitioner, for example, to review the legal basis for claimed cost or for the pricing that was achieved? Does it change the structure of the arguments that have been made up to that date? Well, it certainly could. I mean, at the point that the information was submitted by Good Luck, Your Honor, the Commerce Department determined that it couldn't know exactly what the effects would be of the recalculated costs as well as the new comparisons that would be made. It could have made significant changes or not. It just had no way to know. That was all information that was supposed to have been submitted with its questionnaire responses prior to the end of the period for submitting actual information. Yeah, I understand that. So when the questionnaires came in, did you provide comments to the questionnaire responses? We certainly did, Your Honor. Okay, so once this new calculation is done and you have this cascading effect or changes or whatever, do your comments change? They certainly could have. Yes, they could have. Well, we didn't get to see. I'm asking you whether they did or not. I mean, you tell me. They did not change because Commerce did not accept the information. So during the period of investigation, we were not able to comment on that information. Okay, assuming they had accepted the information, would your comments have changed? Presumably, yes, they would have changed. And we did make arguments when the information was submitted to Commerce. The idea being that while the whole basket of information, the argument of the other side is that, hey, it's all the same information. It's just been re-sifted. But as Your Honor knows, in the dumping case, it's not just that the basket of information is complete. It's how it gets re-sifted. And at the time, the question is, before the court, as we understand it, was it reasonable for Commerce, and not an abuse of discretion, to determine that it could not know what all those cascading effects were? And therefore, it rejected it based on its regulations for submission of factual information. Essentially, it's not allowing... I'm sorry, Your Honor, go ahead. Judge Clevenger, you started your argument by saying that the reversible error here was that the CIT substituted its judgment on factual matters for that of Commerce. I am just looking at Joint Appendix, page 29, where, you know, after the remand determination came back up, you made that complaint to the CIT, and the CIT by saying, no, Mr. Liberta, you didn't understand our decision. We weren't substituting our judgment at all. This is not a substantial evidence case. Instead of substituting our judgment for that of Commerce, we were actually holding Commerce's feet to the fire, and saying, you should exercise your judgment here the way you've done it in other cases. And so the ruling of the CIT is not that it was substituting its judgment, but the under existing case law and Commerce's own practice, Commerce abused its discretion by refusing to accept the minor corrections. So that's point one. Point two, are you going to talk about the elephant in the room? Where is the government? Okay, I'll address that. The government is not defending. The government agreed when the case went back up to the CIT. They agreed with the good law. Well, I'll address both of those, Your Honor. Thank you. So, no, we do think that the Court of International Trade substituted its judgment. We understand that the court's point was that it was applying what it identified as the Commerce Department's test. It cited two cases that happened prior to the Commerce Department's adoption of its regulations for governing the submission of factual information, 351-301, in 2013. It cited the coded paper case as what Commerce's practice was. I'm not sure that one case makes a practice, but in that case... What regulation are you talking about? The opinion of the CIT said that the Commerce hasn't promulgated any regulation that particularly deal with this matter. It promulgated a regulation that deals with the submission of factual information, which Commerce concluded this information was. Commerce has an exception, and that exception is not within the regulation itself, but it's an exception for minor factual information that where small errors are made, they can be corrected. But in this instance, the court below has essentially swallowed the rule with the exception by taking... Essentially, we have huge... Not only were there 600 home market sales that were improperly coded, but there were no costs. Are you talking about an exception in a regulation? No. And if so, despite the regulation and the exception, I may be stupid here, but you're confusing me? I apologize for doing that, Your Honor. The regulation is... Reading at JA-16, the CABC said, notably, no regulation addresses the circumstances under which corrections will be accepted or a time frame within corrections should be submitted. That is correct, Your Honor. That is correct, but that exception... There's no fundamental regulatory guidance here. That exception exists within the regulatory guidance of 351.301. It is not a part of that, but Commerce has said, we are making an exception, and it said so in the decision below. It said we are making that exception in order... Because we recognize that nobody's perfect, and so small clerical errors and things that are easily correctable can be corrected. But in this case, the correction went beyond that. It required the recalculation of costs for 37 condoms. And since that regulation... I'm sorry. And there's an existing case in which the rearrangement of condoms was held to be immaterial. There are a number of cases when the court has said that the department's proper procedure for accepting data shouldn't be interfered with, such as Mid-Continent PO, PCS, VS, MOP. That the department can't set... Or the court can't set aside a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result. Now, just if I may, Your Honor, I would just... And I realize I'm eating my rebuttal time. But to address why the government's not here, the record doesn't say why the government's not here, and I'd be speculating to give a reason why they decided not to show up. But the record does show that the Commerce Department made a detailed explanation why it thought it was right in its original decision. It defended it vigorously at the court. And when it submitted its remand determination based on it being ordered by the court below to accept that information, it did so under respectful protest. It would be speculation for me to conclude why they elected not to. I have recent cases in which all that happened, but Commerce continued to complain when the case went back up to the CIT. So that's the only reason why I saw this case as a little different, because it's the first time I've seen this happen. Typically, I see Commerce continuing to have... objecting under protest to what Commerce told... to what CIT told it to do. It was a surprise to us. Yeah. It was a surprise to us as well, Your Honor. But the parties in the case have equally important rights that need to be protected here in making sure that information is placed on the record in an orderly fashion in which we have full rights of participation. The reason why I raised it is because the decision back after reconsideration by the CIT is so clear in the CIT judge telling us what the rationale for his decision was, that it was existing case law in Commerce's own practice. He was holding Commerce to its practice. And I just wondered if maybe Commerce wasn't agreeing with that point. I don't think so. The practice he cites is from one case from 2009... All right, Mr.... ...before the regulations. You're well over your time. Thank you, Your Honor. But I think it's time to move on to Mr. Marschak. Thank you, Your Honor. Yes. Marschak, you may begin, please. Yes, this is Ned Marschak for Good Luck, Your Honor. We totally agree with the decision of the Court of International Trade,  by overturning Commerce's decision, which we believe was an abuse of discretion and did not follow its own precedent and did not follow the basic purpose of the anti-dumping law, that accuracy and fairness are important, no draconian penalties for political mistakes. The law is remedial, not punitive. Counselor, I'm going to ask you the same question that I asked your friend on the other side. How did this affect the legal posture of the case? I'm talking about we end up with this cascading effect. Had Commerce accepted those changes, would that have changed the legal posture? Would that have required additional arguments for petitioners, for example? I don't believe it would. I mean, we believe it was totally mathematical. The key to the case and the key to the verification are the product-specific costs. And the way we set up our cost system is that we have product-specific costs based on... So when you say purity mathematical, the process itself would have been a mathematical process, but you come out at the end with a different result, correct? Well, yes, the result would be different. I mean, it just so happens the result would have been zero the first way, and it was zero this way, too, as the margin. The result's different. But because of the mathematical changes, which is the last step of the calculation of margins... How do we know it would have been zero? I thought that Commerce did not end up making those calculations. Commerce, in the original determination before Commerce, the final results, Commerce did not make those determinations. There weren't adverse facts available. But then after the Court of International Trade remanded Commerce, that's exactly what Commerce did. Commerce asked us to place on the record the data which we attempted to place on the record, which Commerce rejected. And on September 23, 2019, in Appendix 3492... Was that data presented to the CIT? The data that Commerce rejected was originally presented to the CIT. We put it in an appendix to our brief to the CIT, and the CIT looked at it because the CIT wanted to see what had been rejected. So we put it in an appendix in the CIT, examined the data, and we believe correctly realized... Again, it's the final stage. What do you mean the exam of the data? In our brief to the CIT, Your Honor, we placed as exhibits in our brief to the CIT the documents that Commerce rejected. Correct. And you said that they examined the data. What do you mean by that? The CIT had our brief, it had the exhibits to our brief, and then the CIT came up with its initial decision, basically agreeing with our position that we had a clerical error and it was purely mathematical. Now, I shouldn't speculate as to what the CIT did. I guess I went too far there, but I assume the CIT looked at the appendix or the CIT may have just looked at our brief and agreed with us. Do you think it would have been correct for the CIT to look at the data and say, well, there's no difference in the dumping margins one way or the other? It's a minor clerical error here. No, Your Honor, and the CIT absolutely did not do that. What the CIT did, the CIT recognized that the nature... First, the CIT recognized that the nature of the error was purely clerical, and I think that's something that the Department of Commerce said, it wasn't clerical, it was methodological. So the CIT first said, this is purely clerical, and they realized why, because it was a coding error. We made a mistake in coding. We put the actual wall thickness data was correct, it was verified, and then we coded the wall thickness, we made a mistake. So the CIT first said it was a coding error. Then the CIT recognized that when you make a mistake, if it has a cascading effect, that doesn't turn a coding clerical error into some type of new factual information. So the CIT determined the nature of the error, the CIT looked at the precedent, Commerce precedent, it looked at the purpose of the law, the CIT precedent, and then it said it just remanded the decision to Commerce to look at our data. And then Commerce came back and said, okay, give us the data that we previously rejected. So on September 23rd, 2019, we submitted the data that had been previously rejected, and we gave Commerce a database. Was that the data that you also gave to the CIT? No, we did not. I'm trying to remember, Your Honor. I believe we may have given this data to the CIT, but I don't remember if we gave all the data that we gave in the new database. I think we may have given part of it. I don't think we gave all the data. I just don't know, so I don't want to speculate. But we did give some data to the CIT. On remand, we gave a complete new database using the correct coding, and when we did that, we were able to show Commerce that the underlying data was exactly the same as it was in our original submission, and Commerce was very clear in that. What do you mean the underlying data was exactly the same? When the recalculation is done, don't you end up with different results, cost of production? Okay, when we do cost of production, Your Honor, when I'm talking about the underlying data, I'm talking about how we calculate our costs. We calculate our costs on a product-specific basis. You end up with different numbers, correct? You end up with different final numbers. Yes, and those final numbers is really what counts. Unless you're able to show that the methodology was tainted or was wrong, it's those final numbers that count. Yes, Your Honor, but when you calculate margins, when you set up a cost system and give costs to the Department of Commerce, there's really two critical steps. The first critical step is that you calculate actual costs based on what's in your database, and you have to reconcile those costs to your financial system. So we gave actual costs for almost 4,000 products in our database, and we reconciled that to our financial statement. And then you take those actual product-specific costs Just to kind of shorten this, what you're telling us is that those final numbers that you achieve when you do your cost of production analysis and everything, your pricing analysis, those final numbers that you achieve, those are important and key. Absolutely, Your Honor, critical. So if there's a narrow, whether it's clerical or not, that changes those values, then would you not say that that is a major change? The values that we're talking about, the cost of production, they're reconciled to our financial system. They were not changed. The product stayed the same. The cost stayed the same for each product. What changed is the final stage of the process when you take the individual product costs and you put them into, when you combine them into condoms. So what changed is for certain condoms, the vast majority of condom costs stayed the same. But for certain condoms, let's say approximately 30 condoms, you had a different allocation of actual costs, where the first time you may have had one condom with 10 products, the next time you have one condom with five products, Is the methodology that's used to allocate costs important in a dumping case? Absolutely, but the methodology... It's critical, isn't it? It's critical, but the final methodology, though, and you have an allocation of costs, the product-specific costs, that's critical to get the right cost per product. But once you get that right cost per product, it's basically a ministerial type of work to allocate those costs to condoms. Dennis Clevenger, once you had the right numbers, did the methodology change? Absolutely not. Well, I think that's what the presiding judge is getting at. Of course, the dumping margin, the delta in the end, may be different depending on changes you make. It may be because of arithmetic or clerical error, right? Yes, Your Honor. I mean, it would almost blow the mind if the dumping margin wasn't affected by the change. Right. I mean, the margin change was the condom change, but the methodology is... The fact that the dumping margin changes doesn't mean that a different methodology was used to calculate the dumping margin. Correct, Your Honor. The methodology was identical, the margins changed because the condoms changed. Counsel, this is Judge Stoll, just to make sure I understand correctly. And that methodology specifically, which how to group the condoms and do that, that was something that was specified by Commerce, right? Absolutely, Your Honor. Commerce creates the condoms. So Commerce groups the individual products into condoms based on physical characteristics. And our mistake was coding the condom. So our product-specific costs stayed the same, the costs were identical, but the final step where you have the coding into condoms, the results changed, the methodology was identical, going from a product to a condom is almost ministerial because you have no choice. And going from the product to the condom, the reason why it was different is because you used the condoms that were provided by Commerce previously, like a month earlier, and then Commerce changed it and you didn't use the changed condom. Do I understand that correctly? Yes, we made the clerical mistake in our whole market database of not changing one field wall thickness. We kept the old wall thickness code and we should have put the new wall thickness code and that was our clerical error. Okay, thank you. Yes, Your Honor. Okay, anything else, Mr. Marksek?  and unless you have any more questions, Your Honor, I think we've gone through a lot. Thank you. Okay. Mr. Luberto, you have three minutes of time left. Thank you, Your Honor. I think what's critical here is that the way the Court of International Trade interpreted what was alleged to be practice  for placing data on the record would now swallow the rule. The rejected data left huge holes in the record for cost of production for 37 condoms. This Court has said in numerous cases, Dong Tai Pek, Mid-Continent, Papir Fabric, Kohler, that it's basically protected the Commerce Department's right to enforce its regulations for the orderly placing of data on the record and to enforce those time limits. What the Court below did and what Mr. Marshak is suggesting is it doesn't matter how much the cascading effects are. It doesn't matter what the missing information is. It doesn't matter when it was provided or how much work has to go into correct it. As long as that first mistake was a clerical error of some sort, then everything deserves to be corrected. And that can't be the standard that gets applied. Because the Commerce Department's rules, Your Honor, are set forth to make sure that it has enough time to evaluate all the data and that the parties have enough time to comment and evaluate all the data. There's no argument here that there was inadequate time and basically the timing here was created by Commerce's own change of mind. So I'm just asking you, why is it that, assume that you have one tiny little error and it cascades through the entirety of the submission, why does the amount of the cascading have any effect on the end of it? I'm just asking you. Of course, I mean, it can't happen and I'm asking you why, and you thus far haven't given me an answer. If you had a case where Commerce said, hey, wait a second, the reason why we're rejecting this information is because it's going to take us now forever because you've cascaded through the entire submission and, quite frankly, we're not going to do that. But that's not this case. So tell me why the cascading explanation, which was used by the CIT to defend its decision, why it was incorrect in this case. It was incorrect in this case. That's really all I'm asking. I understand. So it was incorrect in this case because at some point the Commerce Department has to draw a line where it's just too much information for it to be able to process. And the Commerce Department in this case said that there was simply too much information that was missing that would have to be filled in on the record. It has to be able to draw the line somewhere. This was information that should have been provided earlier. Where did Commerce say those words, too much information to process? You'll find that at Appendix... Pardon me, what page in their determination? They go into that Appendix page 2812 and then also on pages 2816 and 2817, 2816 in particular, that it would require recalculation of costs for numerous condoms and assigning, and they don't have correct costs of production. The numerous goes to cascading. Where was it that it was burdensome? It says that any attempts to correct these errors would involve both extensive SAS programming and a complex calculation for good luck's database. So that's on page 2816 of the Appendix. So I'm characterizing, paraphrasing, characterizing. Where on 2816? It's in the middle paragraph that starts additionally. It's the last sentence. Right, but I mean, that's cascading. That's not a matter of burdensome. I thought you were trying to make the point that Commerce was correctly rejecting this because the burden on Commerce was too great. Well, that's the way I would read that. I think that that would be a legitimate explanation, but I didn't see that anywhere expressed in the record. Well, it's not the Commerce Department's burden to create the record. It was the respondent's, and I guess, Your Honor, that I read that paragraph in that manner. In terms of exercising discretion to refuse to accept an offered change, if your explanation is it's going to be too big a burden on us to process then the burden is on Commerce to explain that. I would submit, Your Honor, that that's what Commerce was explaining, but I understand your point. I was pushing you on two points because you made broad statements, and I asked you to defend them in the record, and in both instances you have been unable to do that. So that's all I was doing. I'm trying to get the right answer here, sir. I understand that. An attorney argument that is sort of all-inclusive but lacks support can't be an attorney argument that persuades us. I think you'll appreciate that. I do, Your Honor. Okay. Mr. Lute, Roberto, would you like to conclude, sir? Thank you, Your Honor. I'll do it in two sentences. So in this case, the record shows that the amount of data that the Department had to correct was properly characterized by the Commerce Department as being additional factual information that should have been submitted prior and was not due to the good luck inattentiveness and lack of attention to detail, and therefore its decision should have been upheld originally and the Court of International Trade should not have substituted its judgment for that of the Department. Thank you, Your Honors. Okay. Thank you. We take this case under submission.